1   Richard M. Heimann (CA Bar No. 063607)
    *rheimann@lchb.com*
2   Michael W. Sobol (CA Bar No. 194857)
    *msobol@lchb.com*
3   Roger Heller (CA Bar No. 215348)
4   *rheller@lchb.com*
    Jordan Elias (CA Bar No. 228731)
5   *jelias@lchb.com*
6   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
7   San Francisco, CA 94111-3339
    Telephone: (415) 956-1000
8   Facsimile: (415) 956-1008

9
    Richard D. McCune (CA Bar No. 132124)
10  *rdm@mccunewright.com*
    Jae (Eddie) K. Kim (CA Bar No. 236805)
11  *jkk@mccunewright.com*
12  MCCUNEWRIGHT LLP
    2068 Orange Tree Lane, Suite 216
13  Redlands, California 92374
    Telephone: (909) 557-1250
14  Facsimile: (909) 557-1275

15
    Attorneys for Plaintiff Alicia Kennedy
16  and the Proposed Class
17

18                          UNITED STATES DISTRICT COURT

19                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

20

21  ALICIA KENNEDY, as an individual and on        ) Case No.   11      1222
22  behalf of all others similarly situated,       )
                                                    ) **CLASS ACTION COMPLAINT**
23              Plaintiff,                          )
                                                    ) (1) VIOLATION OF UNFAIR BUSINESS
24        v.                                        ) PRACTICES ACT [BUSINESS &
                                                    ) PROFESSIONS CODE SECTION 17200, ET
25  WELLS FARGO BANK, N.A., and DOES 1             ) SEQ.]; (2) VIOLATION OF UNFAIR
    through 125,                                    ) BUSINESS PRACTICES ACT [BUSINESS
26                                                  ) & PROFESSIONS CODE SECTION 17500,
                Defendants.                         ) ET SEQ.]; (3) BREACH OF THE IMPLIED
27                                                  ) COVENANT OF GOOD FAITH AND FAIR
                                                    ) DEALING; (4) FRAUD
28                                                  )
                                                    ) **DEMAND FOR JURY TRIAL**
                                                    )

-1-

CLASS ACTION COMPLAINT

E-filing

1    Plaintiff ALICIA KENNEDY, on behalf of herself and all others similarly situated (i.e., the

2    members of the proposed class described and defined, *infra*), herein alleges as follows:

3
## I

4
## INTRODUCTION

5    1.    This is a class action seeking monetary damages, restitution, punitive damages, and

6    injunctive relief against Defendant Wells Fargo Bank, N.A. ("Wells Fargo," the "Bank," or

7    "Defendant"), arising from Wells Fargo's unfair and unlawful assessment and collection of excessive

8    overdraft fees.

9    2.    After a bench trial that concluded in May 2010, in the case *Veronica Gutierrez v. Wells*

10    *Fargo Bank, N.A.*, Case No. 3:07-cv-05923-WHA (N.D. Cal.) (the "*Gutierrez* case"), the Honorable

11    William H. Alsup of this Court found Wells Fargo liable for conduct and practices alleged herein, and

12    ordered Wells Fargo to pay restitution to a class of Wells Fargo California customers and to stop certain

13    unlawful practices related to the Bank's assessment of overdraft fees. By its terms, the relief ordered by

14    Judge Alsup applied to improper overdraft charges that the Bank assessed between November 15, 2004

15    and June 30, 2008, the temporal scope of the certified class in the *Gutierrez* case. This action seeks

16    relief for Wells Fargo California customers for improper overdraft charges assessed by the Bank

17    subsequent to the end of the certified class period in the *Gutierrez* case.[1]

18
## II

19
## JURISDICTION AND VENUE

20    3.    This Court has original jurisdiction of this action under the Class Action Fairness Act of

21    2005. The amount-in-controversy exceeds the sum or value of $5,000,000 exclusive of interest and

22    costs, and there is minimal diversity because certain members of the class are citizens of a different state

23    than any defendant as required by 28 U.S.C. § 1332(d)(2).

24    4.    Venue as to Defendant is proper in this judicial District because Defendant is

25    headquartered in the City and County of San Francisco, California.

26

27

28    [1] Given the overlap between the issues raised in this action and in the *Gutierrez* case, many of Judge
Alsup's findings in the *Gutierrez* case are binding in this case under the doctrine of collateral estoppel.

-2-

CLASS ACTION COMPLAINT

### III

### GENERAL ALLEGATIONS

5.     Wells Fargo is a diversified financial services company providing banking, insurance, investments, mortgage banking and consumer finance to individuals, businesses and institutions in all counties within the State of California as well as in most other states, and is headquartered in San Francisco, California.

6.     Wells Fargo maintains branch offices throughout the State of California and in most other states. Individual customer accounts with Wells Fargo are maintained at the branch office where the account was opened.

7.     One of the services offered by Wells Fargo to consumer banking customers is a checking account. One of the benefits the Bank offers with a checking account is a debit card that can be used for a variety of transactions including buying goods and services. In connection with processing the debit-card transactions and other transactions on a daily basis, Wells Fargo charges overdraft fees if an account becomes in a negative position.

8.     Overdraft fees represent the second largest source of revenue for Wells Fargo's consumer deposit group, the division of the Bank dedicated to providing customers with checking accounts, savings accounts, and debit cards. The revenue generated from these fees has been massive. In California alone, Wells Fargo assessed over $1.4 billion in overdraft fees between 2005 and 2007.

9.     Wells Fargo was able to accomplish this enormous revenue and profit from overdraft fees through its development and uniform use of a bookkeeping device, whereby the Bank posts customers' debit transactions each day from highest to lowest in dollar amount, which can turn what would ordinarily be *one* overdraft into as many as *ten* overdrafts, thereby dramatically multiplying the number of overdraft fees the Bank can extract from a single mistake by a customer. Worse yet, the draconian impact of this bookkeeping device has been exacerbated through closely allied Bank practices specifically "engineered" to multiply the adverse impact of the high-to-low posting bookkeeping device. These unfair practices generated colossal sums per year in additional overdraft fees for the Bank. The Bank went to considerable effort to hide these unfair practices from customers while constructing a facade of phony disclosure.

-3-

CLASS ACTION COMPLAINT

1    10.    This is a civil action seeking from Wells Fargo damages and restitution and disgorgement
2  of all amounts the Bank gained as a result of wrongfully taking overdraft fees from Wells Fargo
3  customers through its unfair practices. Plaintiff also seeks remedies for Wells Fargo's failure to
4  adequately notify customers of these practices as well as its affirmative misrepresentations regarding its
5  practices. Plaintiff, on behalf of herself and all others similarly situated, brings claims against Wells
6  Fargo for breach of the implied covenant of good faith and fair dealing, common law fraud, and
7  violations of California's Unfair Competition Law, Business & Professions Code section 17200, *et seq.*,
8  and False Advertising Law, Business & Professions Code section 17500, *et seq.*

9    11.    Plaintiff ALICIA KENNEDY is a resident and citizen of the County of Riverside,
10  California and a Wells Fargo account holder. She entered into her contractual relationship with Wells
11  Fargo in the County of Riverside, California, and her account is currently maintained at a Riverside
12  County Wells Fargo branch office.

13    12.    Based on information and belief, the decisions relating to developing, marketing and
14  implementing the actions complained of herein originated from Wells Fargo in San Francisco,
15  California. For all plans and decisions that originated at Wells Fargo business locations outside of San
16  Francisco, California, those plans and decisions required approval from Wells Fargo's San Francisco,
17  California headquarters, thereby providing Wells Fargo authority and control over the actions
18  complained about herein.

19    13.    The true names and capacities of defendants sued herein as DOES 1 through 125,
20  inclusive, are currently unknown to Plaintiff, who therefore sues such defendants by such fictitious
21  names. Each of the defendants designated herein as a DOE is legally responsible in some manner for
22  the unlawful acts referred to herein. Plaintiff will seek leave of Court to amend this Complaint to reflect
23  the true names and capacities of the defendants designated herein as DOES when such identities become
24  known.

25    14.    Based upon information and belief, Plaintiff alleges that at all times mentioned herein,
26  each and every defendant was acting as an agent and/or employee of each of the other defendants, and at
27  all times mentioned was acting within the course and scope of said agency and/or employment with the
28  full knowledge, permission and consent of each of the other defendants. In addition, each of the acts

-4-

1    and/or omissions of each defendant alleged herein were made known to, and ratified by, each of the

2    other defendants.

3                                              **IV**

4                                   **FACTUAL ALLEGATIONS**

5          15.    At the core of this controversy is a bookkeeping device, adopted and uniformly used by

6    the Bank, called "high-to-low re-sequencing," that transforms one overdraft into as many as ten

7    overdrafts — ten being the voluntary limit the Bank imposed on what could otherwise be an almost

8    limitless prospect.  The Bank instituted this bookkeeping device for California accounts in April 2001,

9    and then soon magnified its impact through its adoption of various closely allied practices.

10   ***Low-to-High vs. High-to-Low***

11         16.    "Posting" is the procedure followed by all banks, including Wells Fargo, to process debit

12   items presented for payment against customers' accounts.  During the hours after midnight, Wells

13   Fargo's posting process takes all debit items presented for payment during the preceding business day

14   and subtracts them from the customer's account balance.  These items include debit-card transactions

15   and checks, plus a few other occasional items described below.  If the customer's account balance is

16   sufficient to cover all such debit items, there will be no overdraft fees assessed regardless of the posting

17   sequence used.  If, however, the account balance is insufficient to cover all such debit items, then the

18   customer's account will be overdrawn.  When an account is overdrawn, the posting sequence can have a

19   dramatic effect on the *number* of overdrafts assessed to the account (even though the total overdraw, and

20   remaining balance after all debits are posted, will be exactly the same regardless of posting sequence).

21   In turn, the *number* of overdrafts directly relates to the *number* of overdraft fees the Bank imposes on

22   the customer.

23         17.    Prior to April 2001, Wells Fargo used a low-to-high posting order in California, as did

24   most banks (then and now).  Low-to-high posting meant that the Bank posted settled debit items from

25   lowest-to-highest in dollar amount each posting day.  Low-to-high posting paid as many items as the

26   account balance could possibly cover first, and thus *minimized* the number of overdrafts and overdraft

27   fees imposed on customers.  This was because the smallest purchases were always deducted from the

28   customer's account first, and the balance was used up as slowly as possible.

                                              -5-

1    18.    This changed in April 2001. Then, Wells Fargo did an about-face in California and
2    began posting debit-card transactions in high-to-low order (*i.e.*, in the order of highest to lowest in dollar
3    amount) each posting day. The reversal of the Bank's previous low-to-high posting order had the
4    immediate effect of *maximizing* the number of overdraft fees imposed on customers. This was exactly
5    the reason that the Bank made the switch.

6    19.    To illustrate, assume that a customer has $100 in his account and uses his debit card to
7    buy ten small items totaling $99, followed by one large item for $100, all of which are presented to the
8    Bank for payment on the same business day. Using a low-to-high posting order, there would be only be
9    one overdraft — the one triggered by the $100 purchase which occurred last. Using a high-to-low
10   posting order, however, the same transactions would result in *ten* overdrafts — because the largest $100
11   item would be posted first and thus would use up the balance as quickly as possible, and each of the
12   smaller transactions (each of which occurred before the $100 purchase) posted thereafter would generate
13   an overdraft.

14   *Commingling And Shadow Line*

15   20.    The switch in April 2001 to high-to-low posting in California was followed by two
16   closely allied practices, both of which were intentionally "engineered" — to use the term the Bank itself
17   used at the time — to amplify the overdraft-multiplying effect of high-to-low ordering: (1) a switch to
18   commingling in a single posting group of debit-card transactions with checks and automated clearing
19   house ("ACH") transactions in December 2001; and (2) the deployment of a secret "shadow line" in
20   May 2002, whereby the Bank began authorizing customers' debit-card purchases into overdraft.

21   21.    Regarding commingling, before December 2001, all debit-card transactions were posted
22   prior to checks, and all checks were posted prior to ACH transactions. While transactions for each
23   transaction type were already being re-sequenced in high-to-low order (since April 2001), the different
24   transaction types were posted separately.

25   22.    In December 2001, however, Wells Fargo began commingling debit-card transactions,
26   checks, and ACH transactions together in a single posting group, and posting the entire group from
27   highest-to-lowest in dollar amount. This amplified the overdraft-multiplying effect of high-to-low
28   posting. Checks and ACH transactions — which tended to be the larger items — now consumed the

-6-

1  account balance even faster than if all debit-card transactions had been deducted before checks and ACH
2  transactions (debit-card purchases typically being smaller).

3      23.    The next step was executed in May 2002, when Wells Fargo implemented a practice
4  involving a secret program the Bank called the "shadow line." Until May 2002, the Bank would decline
5  customers' debit-card purchases (*i.e.,* not authorize them at the point of sale) when the account's
6  available balance was insufficient to cover the purchase amount at the time of the authorization request.
7  Following a change in practice in May 2002, the Bank began secretly authorizing customers' debit-card
8  transactions into overdraft, providing no warning to the customer that the transaction in question would
9  result in an overdraft. Specifically, this was done without any notification to the customer at the point of
10  sale that their transaction would cause an overdraft and result in an overdraft fee. Thus, a customer
11  purchasing a two-dollar coffee would unwittingly incur a $30-plus overdraft fee. Internally, Wells
12  Fargo called this its "shadow line," as in shadow "line of credit." The amount (or ceiling) of the shadow
13  line of credit varied from customer to customer based on an algorithm used by the Bank. The amount of
14  each customer's credit ceiling was kept secret. Again, customers were not even alerted when shadow-
15  line extensions were made to them — until it was too late and overdraft fees were already incurred. In
16  implementing the "shadow line" program, the Bank correctly expected that it would make more money
17  in overdraft fees than it would ever lose due to "uncollectibles" (*i.e.*, overdraft transactions that are not
18  paid back).

19  **Wells Fargo's Profiteering Motive**

20      24.    Wells Fargo's sole motive in adopting high-to-low posting—and in adopting the allied
21  "comingling" and "shadow line" practices—was to maximize the number of customer overdrafts and
22  thus squeeze as much as possible out of what it called its "ODRI customers" (overdraft/returned item),
23  and particularly out of the small percentage of customers the Bank recognized accounted for a large
24  proportion of the Bank's overdraft and retuned-item revenue. As the Bank was well aware, these
25  customers, by definition, tended to be the customers who could least afford to be assessed excessive
26  fees.

27      25.    Internal bank memos pertaining to a bank-wide plan called "Balance Sheet Engineering"
28  ("BSE") demonstrate that the challenged practices were implemented for no other purpose but to

-7-

CLASS ACTION COMPLAINT

1  increase overdrafts and overdraft fee revenue. The BSE plan included commingling of debit-card

2  transactions with checks and ACH transactions, extension of the "shadow line" to debit card purchases,

3  and the high-to-low posting order, which were all adopted exclusively to generate more overdraft fees

4  and fee revenue at the expense of depositors.

5      26.    At all relevant times, Wells Fargo had the necessary information and ability to post its

6  customers' debit transactions in low-to-high order. Similarly, at all relevant times, Wells Fargo had the

7  necessary information and ability to post its customers' debit transactions (or at least all but a very small

8  number of such transactions) in chronological order, based on the date and time the transactions were

9  authorized by the Bank. Specifically, at all relevant times, Wells Fargo received and recorded the

10  authorization date and time for all customer debit transactions (or at least all but a very small number of

11  such transactions). Before and during the proposed class period in this case, the Bank considered the

12  possibility of posting customers' transactions chronologically, but opted not to do so because of the

13  negative impact doing so would have on its overdraft revenue. Subsequent to Judge Alsup's order in the

14  *Gutierrez* case, in which Judge Alsup ordered the Bank to cease its unfair high-to-low posting practice

15  in California, in approximately November 2010, Wells Fargo adopted chronological posting for debit

16  card transactions in California to comply with Judge Alsup's order.

17  ***Misleading Materials and Inadequate Disclosures***

18      27.    Given the harsh impact of the Bank's high-to-low posting practice and allied practices,

19  the Bank was obligated to plainly warn depositors beforehand regarding such practices. Instead, the

20  Bank went to great lengths to hide these practices from its customers while promulgating a facade of

21  phony disclosure. The Bank's own marketing materials—including materials provided to customers

22  when they open their accounts—were deceptive in leading customers to expect debit card purchases to

23  be debited in the order in which they were made (rather than to be re-sequenced in high-to-low order, as

24  the Bank did). These misleading materials and inadequate disclosures were likely to deceive reasonable

25  depositors.

26      28.    Likewise, the Wells Fargo Consumer Account Agreement ("CAA") failed to adequately

27  disclose the Bank's practices. The Bank's CAA was at all relevant times a lengthy document and a form

28  contract of adhesion. The CAA is given to most, though apparently not all, customers when they open a

-8-

CLASS ACTION COMPLAINT

1  new account. Wells Fargo is aware that many, if not most, customers do not read the CAA, either at the
2  time they open their account or otherwise. The CAA did not adequately disclose Wells Fargo's posting
3  practices. It contained a section entitled "Debiting Your Account; Order of Posting". This section
4  stated, in relevant part:

5          The Bank *may* post Item presented against your Account in any order we
6          choose, unless the laws governing your Account either requires or
7          prohibits a particular order. For example, the Bank *may, if it chooses,* post
8          Items in the order of the highest dollar amount to the lowest dollar
9          amount. The Bank may change the order of posting Items to the Account
10         at any time without notice. (emphasis added)

11     29.    While the CAA used the phrase "For example, the Bank *may, if it chooses,* post Items in
12  the order of highest dollar amount to lowest dollar amount," Wells Fargo was then *actually* posting cash
13  withdrawals, debit-card, check, and ACH transactions from highest-to-lowest in dollar amount.

14     30.    The phrasing "may" and "choose" suggested to customers that the Bank would either
15  exercise discretion or that it had not yet chosen to go to a high-to-low posting scheme. In fact, the Bank
16  knew that it was already imposing and would continue to impose high-to-low bookkeeping — the worst
17  possible posting order from the customer's perspective.

18     31.    The language in Wells Fargo's CAA concerning order of posting was materially the same
19  during the time Wells Fargo posted high-to-low in California as it was before Wells Fargo adopted high-
20  to-low posting in California in May 2001 (*i.e.*, the language was the same when Wells Fargo was
21  posting in low-to-high order). No notice, in the CAA or otherwise, was ever given to customers
22  regarding Wells Fargo's change to high-to-low posting.

23     32.    Moreover, the CAA provision concerning posting order was buried within a sea of single-
24  spaced, small-font text stretching over some 60 pages. No reasonable depositor could be expected to
25  read the entire document or locate the "disclosure" regarding posting order within the Bank's CAA.
26  Moreover, even if the customer read the CAA, no reasonable depositor could be expected to understand
27  the "disclosure" regarding posting order and overdraft fees, especially given the deceptive use of "may"
28  throughout the posting order provision.

-9-

CLASS ACTION COMPLAINT

1    33.    No other Wells Fargo documents adequately disclosed the Bank's practices to customers
2    in California. Wells Fargo's Consumer Account Fee and Information Schedule, which — like the CAA
3    — was generally provided to Wells Fargo customers when they opened a new account, similarly failed
4    to disclose how transactions were re-sequenced or how a high-to-low posting order could impact the
5    number of overdraft fees the bank assessed.

6    34.    The Bank's inadequate, unclear disclosures regarding posting order were exacerbated by
7    misleading information disseminated by Wells Fargo which reinforced the reasonable customer
8    expectation that transactions would be deducted from their accounts in chronological order.

9    35.    A running theme in Wells Fargo's marketing was that debit-card purchases were
10   "immediately" or "automatically" deducted from an account. This would lead the reasonable customer
11   to believe: (1) that the amounts of their debit transactions would be deducted from their checking
12   account in the order in which the transactions were made; and (2) that their purchases would not be
13   approved if they lacked sufficient available funds in their account to cover the transaction.

14   36.    Wells Fargo's misrepresentations in this regard were very widely disseminated and
15   distributed, in a wide array of marketing materials, such that customers were likely to be exposed to, and
16   misled by, them.

17   37.    Furthermore, when a customer used Wells Fargo's online banking service, the Bank
18   would display "pending" debit-card purchases in chronological order, further leading customers to
19   believe that their transactions would be processed (and the funds taken from their accounts) in that
20   order. In reality, debit-card purchases were never posted in this order during the class period, as the
21   Bank well knew. Nothing on the Bank's online-banking website warned customers that the pending
22   transactions, displayed chronologically to customers, would be re-sequenced behind the scenes and
23   posted in high-to-low order to maximize overdrafts and overdraft fees.

24   *Complaints From Wells Fargo Customers*

25   38.    Based on information and belief, Wells Fargo has received thousands of customer
26   complaints regarding overdraft fees. These included many complaints written by California Wells Fargo
27   customers who found themselves on the receiving end of a cascade of overdraft charges caused by high-
28   to-low re-sequencing. Customers have indicated that they cannot figure out how they were charged with

-10-

1  so many overdraft fees, and have expressed indignation that their transactions were "re-dated," "re-
2  arranged," and "manipulated" from the order in which they had occurred. However, Wells Fargo took
3  no action in response to improve its disclosure materials so that it adequately disclosed its practices.

### *Plaintiff Alicia Kennedy*

39.    Plaintiff Alicia Kennedy opened a checking account at a Wells Fargo branch in the
County of Riverside, California. When opening her account, Plaintiff Kennedy was never told about the
Bank's posting order for debit-card transactions or about overdraft fees. She did not know about the
high-to-low posting order, and instead expected that her debit-card transactions would post in the order
in which they occurred.

40.    Plaintiff Kennedy kept track of her account by looking at her online account information
and keeping an approximate mental record of her account balance.

41.    Plaintiff Kennedy has been charged overdraft fees by Wells Fargo on at least four
different occasions prior to July of 2010. In each instance, she incurred additional overdraft fees which
she would not have incurred had the Bank posted her transactions chronologically, in the order in which
they were authorized by the Bank. For example, on Friday, October 26, 2009, she had four items post to
her account: (i) an October 23, 2009 Inland Valero gas charge for $20; (ii) an October 24, 2009 debit-
card purchase from Rainbow for $10.29; (iii) an October 25, 2009 debit-card purchase from Don
Charros Cardon for $20.25; and (iv) an October 26, 2009 recurring bill payment for $400. Plaintiff
Kennedy had not anticipated that the recurring bill payment would be occurring that day. At the
conclusion of the posting of these four transactions, her account was in the negative by a total of
$22.78. If Wells Fargo had posted these four transactions in the order in which they occurred, the $400
recurring bill payment would have posted last, and would have caused the one and only $35 overdraft
fee assessed to Plaintiff Kennedy for transactions posting that day. Instead, Wells Fargo, pursuant to its
practice, re-ordered the four transactions from highest to lowest in dollar amount, posting the $400
transaction that had occurred the latest in time before all of the earlier transactions. This posting scheme
caused Plaintiff Kennedy to incur two overdraft fees of $35, instead of one such fee. These two $35
overdraft fees (totaling $70) posted to Plaintiff Kennedy's account the next day, on October 27, 2009.
That same day, Plaintiff made a deposit covering both the negative $22.78 balance and the $70 in

-11-

CLASS ACTION COMPLAINT

1    overdraft fees, bringing her account to a positive balance. In short, she paid $70 for a one-day loan of
2    $22.78. That equates to a usury annual interest rate for this loan of over 1,000%.

3         42.    Plaintiff Kennedy would not have made the purchases that resulted in the overdraft fees
4    she incurred on October 27, 2009 if she had been warned or advised that they would result in overdraft
5    fees, or that Wells Fargo would manipulate the order of her transactions to increase the number of
6    overdraft fees she would be assessed. Even after being assessed these overdraft fees in October 2009,
7    she still did not understand the Bank's undisclosed and extremely complicated high-to-low posting
8    practice.

9         43.    Plaintiff Kennedy was harmed by the Bank's re-sequencing practice. She was deceived
10   by the Bank's obfuscation of its high-to-low posting practice, which in this instance turned one overdraft
11   into two overdrafts. Plaintiff did not benefit from the Bank's high-to-low posting practice in any way.
12   All of the transactions at issue were authorized and paid, and would have likewise been authorized and
13   paid if the Bank posted them in the order in which they were authorized. The only effect of the Bank's
14   re-sequencing of her transactions from highest to lowest was to unfairly increase the number of
15   overdraft fees she incurred.

16                              **V**

17             **CLASS ACTION ALLEGATIONS**

18        44.    Plaintiff initially proposes a class defined as follows:

19             All Wells Fargo customers from July 1, 2008 to June 30, 2010, who

20             incurred overdraft fees on debit card transactions as a result of the bank's

21             practice of sequencing transactions from highest to lowest.

22       Excluded from this class is any entity in which Defendant has a controlling interest, and officers
23   or director of Defendant.

24        45.    This action is brought as a class action and may properly be so maintained pursuant to the
25   provisions of the Federal Rules of Civil Procedure 23(a) and 23(b).

26        46.    **Numerosity**– The members of the class are so numerous that their individual joinder is
27   impracticable. Plaintiff is informed and believes that there are at least hundreds of thousands of
28   customers in the class. Since the class members may be identified through business records regularly

-12-

1 | maintained by Defendant and its employees and agents, the number and identities of class members can
2 | be ascertained. Members of the class can be notified of the pending action by e-mail, mail and
3 | supplemented by published notice, if necessary.

4 | 47. **Existence and Predominance of Common Question of Fact and Law** – There are
5 | numerous questions of law and fact common to the class. These questions predominate over any
6 | questions affecting only individual class members. These common legal and factual issues include, but
7 | are not limited to:

8 |     a. Whether Defendant re-sequenced debit transactions from highest to lowest in dollar
9 |       amount.

10 |     b. Whether Defendant failed to adequately disclose its high-to-low posting practice to its
11 |       customers.

12 |     c. Whether Defendant misrepresented its posting practices.

13 |     d. Whether Defendant's high-to-low posting practice results in additional instances of
14 |       overdrafts and overdraft fees on debit-card transactions compared to a low-to-high or
15 |       chronological posting order.

16 |     e. Whether Defendant's primary motive for adopting and using the high-to-low posting
17 |       order was to drive up the number of overdraft fees assessed, and thereby profit at the
18 |       expense of its customers.

19 |     f. Whether Defendant's conduct as alleged herein constitutes violations of the causes of
20 |       action set forth below; and

21 |     g. Whether Plaintiff and the class are entitled to damages and/or restitution as a result of
22 |       Defendant's conduct as alleged herein.

23 | 48. **Typicality** – The claims of the representative Plaintiff are typical of the claims of the
24 | class members. Plaintiff, like all other members of the proposed class, has sustained damages arising
25 | from Defendant's violations of the laws, as alleged herein. The representative Plaintiff and the members
26 | of the proposed class were and are similarly or identically harmed by the same unlawful, deceptive,
27 | unfair, systematic and pervasive misconduct engaged in by Defendant.

28 |

-13-

CLASS ACTION COMPLAINT

49.     **Adequacy** – The representative Plaintiff will fairly and adequately represent and protect the interests of the class members and has retained counsel who are experienced and competent trial lawyers in consumer class action litigation.  There are no material conflicts between the claims of the representative Plaintiff and the members of the proposed class that would make class certification inappropriate.  Counsel for the class will vigorously assert the claims of all class members.

50.     **Predominance and Superiority** – This suit may be maintained as a class action under Federal Rules of Civil Procedure 23(b)(3) because questions of law and fact common to the class predominate over the questions affecting only individual members of the proposed class and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by individual class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct.  Further, it would be virtually impossible for the members of the proposed class to individually redress effectively the wrongs done to them.  Even if class members themselves could afford such individual litigation, the court system could not.  In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

51.     Plaintiff contemplates the eventual issuance of notice to the proposed class members setting forth the subject and nature of the instant action.  Defendant's own business records and electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff would contemplate the use of additional media and/or mailings.

52.     In addition to meeting the statutory prerequisites to a class action, this action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

-14-

1          a.     Without class certification and determination of declaratory, injunctive, statutory

2 and other legal questions within the class format, prosecution of separate actions by individual class

3 members will create the risk of:

4          i.     Inconsistent or varying adjudications with respect to individual class

5 members which would establish incompatible standards of conduct for the parties; and

6          ii.     Adjudication with respect to individual class members which would as a

7 practical matter be dispositive of the interests of the other members not parties to the adjudication or

8 substantially impair or impede their ability to protect their interests;

9          b.     Defendant has acted or refused to act on grounds generally applicable to each

10 member of the proposed class, thereby making appropriate final injunctive or corresponding declaratory

11 relief with respect to the class as a whole;

12          c.     Common questions of law and fact exist as to the members of the proposed class

13 and predominate over any questions affecting only individual members, and a class action is superior to

14 other available methods of the fair and efficient adjudication of the controversy, including consideration

15 of:

16          i.     The interests of the class members in individually controlling the

17 prosecution or defense of separate actions;

18          ii.     The extent and nature of any litigation concerning controversy already

19 commenced by or against members of the proposed class;

20          iii.     The desirability or undesirability of concentrating the litigation of the

21 claims in the particular forum;

22          iv.     The difficulties likely to be encountered in the management of a class

23 action.

24

25

26

27

28

CLASS ACTION COMPLAINT

## VI

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of Business And Professions Code Section 17200 *et seq.* – Unlawful, Fraudulent, and Unfair Business Acts and Practices**

53.     Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein.

54.     Defendant's acts and practices as described herein constitute unlawful, fraudulent, and unfair business acts and practices, in that: (1) Defendant's practices described herein violate common law and each of the statutes as set forth within this Complaint; (2) Defendant's conduct described herein, was perpetrated in bad faith and constitutes a breach of the implied covenant of good faith and fair dealing implicit in the contracts between Defendant and each of its customers; (3) Defendant's conduct described herein is contrary to legislatively declared policies, including, but not limited to, as declared in California Commercial Code § 4303(b) & cmt. 7 thereto, and the implied covenant of good faith and fair dealing, as long recognized and interpreted by California courts, including, *inter alia*, in *Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 923 (1985); (4) the justification for Defendant's conduct is outweighed by the gravity of the consequences of such conduct to Plaintiff and the members of the proposed class; (5) Defendant's conduct is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and the members of the proposed class; and (6) the uniform conduct of Defendant—including both its failure to adequately disclose its practices and its affirmative misrepresentations—have a tendency to deceive reasonable consumers, and did deceive Plaintiff and the members of the proposed class.

55.     Defendant's unlawful, unfair and fraudulent business acts and practices are described herein and include, but are not limited to: manipulating the posting order of customers' debit-card transactions for the purpose of artificially increasing the number of overdraft occurrences and the number of overdraft fees imposed on customers, failing to disclose to customers its manipulation of debit-card transactions, and affirmatively misrepresenting its practices to customers.

-16-

1    56.    Defendant's practices are "unfair" under the UCL, as they run afoul of California's

2  legislatively declared policy, as set forth in the legislative comment to California Commercial Code

3  Section 4303(b), which states:

4    The only restraint on the discretion given to the payor bank under

5    subsection (b) is that the bank *act in good faith. For example, the bank*

6    *could not properly follow an established practice of maximizing the*

7    *number of returned checks for the sole purpose of increasing the amount*

8    *of returned check fees charged to the customer.* (emphasis added)

9  Defendant's practices are "unfair" under the UCL for the additional reason that they run afoul of

10  California's well established common law concerning the implied covenant of good faith and fair

11  dealing, as long established and interpreted by California courts, including, *inter alia*, in *Perdue v.*

12  *Crocker Nat'l Bank*, 38 Cal. 3d 913, 923 (1985).

13    57.    Defendant's practices are "fraudulent" under the UCL because, *inter alia*, Wells Fargo

14  failed to adequately disclose its high-to-low posting practice and made affirmative misrepresentations to

15  customers. Defendant knew that these omissions and misrepresentations were false and misleading at

16  the time it made them, and such omissions and misrepresentations were specifically designed to induce

17  reliance by customers.

18    58.    Defendant's omissions and misrepresentations were material in that a reasonable person

19  would attach importance to such information and would be induced to act upon such information in

20  making decisions. Defendant knew that its omissions and misrepresentations were material when it

21  made them.

22    59.    Defendant's omissions and misrepresentations were objectively material to the

23  reasonable consumer, and therefore reliance on them may be presumed as a matter of law.

24    60.    Defendant's omissions and misrepresentations were likely to mislead and deceive the

25  public, and did mislead and deceive Plaintiff and the members of the proposed class.

26    61.    Plaintiff and the members of the proposed class reasonably relied on Defendant's

27  omissions and misrepresentations to their detriment.

28

-17-

CLASS ACTION COMPLAINT

62. In addition to the above, the conduct as alleged throughout the complaint constitutes breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and fraud that not only result in liability as individual causes of action, but further provide the basis for a finding of liability under Business and Professions Code section 17200 *et seq.*

63. Plaintiff and each member of the proposed class have been damaged by Defendant's practices by incurring overdraft charges they otherwise would not have incurred.

64. The conduct of Defendant as described herein violates Business and Professions Code section 17200 *et seq.*

65. Pursuant to Business and Professions Code sections 17200 and 17203, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as prayed for below.

## SECOND CAUSE OF ACTION

**Violation of Business and Professions Code Section 17500 *et seq.* – False Advertising**

66. Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein.

67. Defendant has committed acts of untrue and misleading advertising, as defined by Business and Professional Code section 17500 *et seq.*, by, *inter alia*: (a) failing to disclose its high-to-low posting practice to customers; and (b) making pervasive, widely-disseminated affirmative misrepresentations to customers regarding the order in which transactions are processed.

68. Defendant's misrepresentations and omissions described herein have the tendency to deceive and mislead the public, and did deceive and mislead Plaintiff and the members of the proposed class.

69. Defendant's omissions and misrepresentations were material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making decisions. Defendant knew that its omissions and misrepresentations were material when it made them.

70. Defendant's omissions and misrepresentations were objectively material to the reasonable consumer, and therefore reliance on them may be presumed as a matter of law.

-18-

1    71.    Defendant's omissions and misrepresentations were likely to mislead and deceive the

2    public, and did mislead and deceive Plaintiff and members of the proposed class.

3    72.    Plaintiff and the members of the proposed class reasonably relied to their detriment on

4    Defendant's misrepresentations and omissions, and were damaged as a result by incurring overdraft

5    charges they otherwise would not have incurred.

6    73.    Plaintiff, on behalf of herself and all others similarly situated, seeks relief as prayed for

7    below.

8    ### THIRD CAUSE OF ACTION

9    ### Breach of the Implied Covenant of Good Faith and Fair Dealing

10    74.    Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged

11    herein.

12    75.    Under California law, where a contract confers on one party a discretionary power

13    affecting the rights of the other, a duty is imposed to exercise such discretion in good faith and in

14    accordance with fair dealing. Here, Defendant's contract with Plaintiff and the class, as embodied by

15    the CAA, confers discretionary power to Wells Fargo for choosing a posting order for debit-card

16    transactions. However, Wells Fargo has exercised this discretion in bad faith, as it has chosen a high-to-

17    low posting order, against the reasonable expectations of customers, in order to artificially increase the

18    number of overdrafts and overdraft fees assessed, and thus unfairly increase its profits at the expense of

19    Plaintiff and the class.

20    76.    Meanwhile, Plaintiff and Class members have performed all, or substantially all, of the

21    obligations imposed on them under the CAA.

22    77.    Plaintiff and the members of the proposed class have been damaged as a result of

23    Defendant's breach of the implied covenant of good faith and fair dealing by incurring overdraft charges

24    they otherwise would not have incurred, and seek relief as prayed below.

25    ### FOURTH CAUSE OF ACTION

26    ### Fraud

27    78.    Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged

28    herein.

-19-

79. The misrepresentations, non-disclosure, and concealment of material facts made by Defendant to Plaintiff and the members of the proposed class, as set forth herein, were known by Defendant to be false, misleading and material when they were made, and were intended by Defendant to mislead Plaintiff and the members of the proposed class.

80. Defendant's omissions and misrepresentations were material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making decisions. Defendant knew that its omissions and misrepresentations were material when it made them.

81. Defendant's omissions and misrepresentations were objectively material to the reasonable consumer, and therefore reliance on them may be presumed as a matter of law.

82. Plaintiff and the members of the proposed class reasonably relied to their detriment on Defendant's omissions and misrepresentations.

83. Defendant's omissions and misrepresentations were likely to mislead and deceive the public, and did mislead and deceive Plaintiff and members of the proposed class.

84. Plaintiff and the members of the proposed class were actually misled and deceived by Defendant's omissions and misrepresentations, and were thereby induced by Defendant to incur overdraft charges they otherwise would not have incurred. Had Plaintiff and the members of the proposed class known that their transactions would result in additional instances of overdraft charges as a result of the Bank's practices, they would not have entered into those transactions.

85. As a result of Defendant's conduct, Plaintiff and the members of the proposed class have been damaged by having incurred unwarranted overdraft fees, and seek relief as prayed below.

86. In addition to damages, Plaintiff, on behalf of herself and all others similarly situated, seeks punitive and exemplary damages pursuant to California Civil Code § 3294, since Defendant, through its conduct described herein, engaged in "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant[s] with the intention on the part of the defendant[s] of thereby depriving a person of property or legal rights or otherwise causing injury."

**VII**

-20-

1

**PRAYER FOR RELIEF**

2        WHEREFORE, Plaintiff, on behalf of herself and the putative class, prays for relief as follows:

3        A.        For an order certifying the class and appointing Plaintiff and her counsel to represent the

4   class;

5        B.        For an order awarding Plaintiff and the class damages, restitution, and disgorgement and

6   other equitable relief as the Court deems proper;

7        C.        For an order awarding Plaintiff and the class punitive or exemplary damages;

8        D.        For an order permanently enjoining Defendant from engaging in the unfair, unlawful, and

9   deceptive conduct described herein;

10       E.        For an order awarding Plaintiff and the class pre-judgment and post-judgment interest, as

11  well as their attorneys' and expert-witness fees and other litigation costs and expenses; and

12       F.        For an order awarding such other and further relief as this Court may deem just and

13  proper.

14  DATED:  March 11, 2011                    Respectfully  submitted,

15                                            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

16

17                                            By:

18                                            Richard M. Heimann (State Bar No. 063607)
19                                            Michael W. Sobol (State Bar No. 194857)
                                              Roger N. Heller (State Bar No. 215348)
20                                            Jordan Elias (State Bar No. 228731)
                                              275 Battery Street, 29th Floor
21                                            San Francisco, CA  94111-3339
                                              Telephone:  (415) 956-1000
22                                            Facsimile:  (415) 956-1008

23                                            Richard D. McCune (State Bar No. 132124)
24                                            *E-mail: rdm@mccunewright.com*
                                              Jae (Eddie) K. Kim (State Bar No. 236805)
25                                            *E-mail: jkk@mccunewright.com*
                                              McCUNEWRIGHT, LLP
26                                            2068 Orange Tree Lane, Suite 216
                                              Redlands, CA 92374
27                                            Telephone: (909) 557-1250
                                              Facsimile: (909) 557-1275
28
                                              *Attorneys for Plaintiff and the Proposed Class*

-21-

CLASS ACTION COMPLAINT

1                       **DEMAND FOR JURY TRIAL**

2     Plaintiff, on behalf of herself and all others similarly situated, hereby demands a trial by jury.

3

4   DATED: March 11, 2011                Respectfully submitted,

5

6                          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

7                       By:

8

9                        Richard M. Heimann (State Bar No. 063607)
                       Michael W. Sobol (State Bar No. 194857)

10                    Roger N. Heller (State Bar No. 215348)
                       Jordan Elias (State Bar No. 228731)
                       275 Battery Street, 29th Floor

11                    San Francisco, CA 94111-3339
                       Telephone: (415) 956-1000

12                    Facsimile: (415) 956-1008

13                    Richard D. McCune (State Bar No. 132124)

14                    *E-mail: rdm@mccunewright.com*
                       Jae (Eddie) K. Kim (State Bar No. 236805)

15                    *E-mail: jkk@mccunewright.com*
                       McCUNEWRIGHT, LLP

16                    2068 Orange Tree Lane, Suite 216
                       Redlands, CA 92374

17                    Telephone: (909) 557-1250
                       Facsimile: (909) 557-1275

18

19                    *Attorneys for Plaintiff and the Proposed Class*

20   913924.1

21

22

23

24

25

26

27

28

-22-